UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TATYANA LITVINOVA,

Plaintiff,

v.

KAISER FOUNDATION HOSPITALS,

Defendant.

Case No.  25-cv-06253-SI

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT AND REMANDING ACTION TO SUPERIOR COURT**

Re: Dkt. No. 33

Before the Court is a motion by defendant Kaiser Foundation Hospitals ("Kaiser") to dismiss plaintiff Tatyana Litvinova's first amended complaint ("FAC") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  Dkt. No. 33 ("Mot."); *see* Dkt. No. 29 (FAC).  The Court heard oral argument on Kaiser's motion on February 13, 2026.  Dkt. No. 45.  For the reasons set forth below, the Court DENIES Kaiser's motion and REMANDS the action to the Superior Court of California, County of San Francisco.

## BACKGROUND

### I.    Allegations of the FAC

Plaintiff Tatyana Litvinova is a licensed registered nurse who has been employed by defendant Kaiser Foundation Hospitals since March 30, 1992.  Dkt. No. 29 ("FAC") ¶¶ 8, 10(a).  Since the beginning of her employment at Kaiser, Litvinova has worked in the post anesthesia care unit ("PACU") at Kaiser's Oakland Medical Center, where she "car[es] for critically ill patients recovering from anesthesia and surgery."  *Id.* ¶ 10(a).  Litvinova has advanced to "Staff Nurse IV, the highest clinical level for nurses at Kaiser, requiring at least eight years of clinical experience and

demonstrated excellence in patient care and professional leadership." *Id.* ¶ 10(c). Litvinova also "served as Resource Healthcare Coordinator, a charge nurse leadership position responsible for patient flow coordination, staff assignments, communication with physicians and hospital operations, and ensuring safe patient care delivery after regular management hours." *Id.* Between 1992 through 2022, Litvinova had no disciplinary history and had "consistently excellent" performance evaluations. *Id.* ¶ 10(d).

### A. Litvinova's Complaints

Litvinova's concerns began "[a]lmost immediately" after Kaiser assigned Ana House as the new PACU Nurse Manager in September 2022. *Id.* ¶ 10(f). Litvinova "observed serious violations of state and federal healthcare regulations that endangered critically ill post-operative patients." *Id.* On October 25, 2022, Litvinova filed a standard of care violation report against House stating that "House was assigning nurses without proper PACU qualifications, training, or critical care experience to provide coverage for critically ill patients recovering from anesthesia." *Id.* ¶ 10(g). The complaint alleged that House's staffing practices were in violation of state and federal laws requiring, for example, nurses with certain education and training, and "adequate staffing to ensure patient safety." *Id.* Litvinova sent the report to House and Director Sumi Yi. *Id.*

On October 31, 2022, Litvinova submitted a second complaint "regarding ongoing unsafe and understaffed conditions in the PACU." *Id.* ¶ 10(i). Litvinova sent this complaint to Yi and Chief Nurse Executive Pavna Sloan. *Id.* Litvinova made the October 25 and 31 "complaints in her individual capacity as a licensed healthcare professional with mandatory reporting duties under California law, not in any representational capacity." *Id.* ¶ 10(k).

"On November 10, 2022, management held a meeting with" Litvinova, Yi, and Sloan regarding Litvinova's concerns about patient safety.[1] *Id.* ¶ 10(j). "During the meeting, management

---

[1] The FAC does not allege facts identifying who is "management." There are also no facts indicating whether or how management responded during the meeting to Litvinova's complaints.

United States District Court
Northern District of California

praised Plaintiff's advocacy work and expressed appreciation for her raising these important safety concerns." *Id.*

Litvinova continued to report patient safety violations between 2023 and 2025. *Id.* ¶ 10(l). On July 24, 2023, Litvinova sent a letter to Kaiser Chief Executive Officer Gregory Adams regarding "ongoing patient safety violations, management incompetence, and retaliation in the PACU." *Id.* ¶ 10(m). In this letter, Litvinova reported that House lacked experience and was thus unqualified to manage the PACU, committed scheduling and payroll errors, and was unable to assess job performances of nurses. *Id.* Litvinova also reported that another nurse, Hanna,[2] had informed Litvinova that House had asked Hanna to help get rid of Litvinova and, when Hanna refused to do so, "Hanna became a target herself." *Id.* ¶ 10(n); *id.* ¶ 10(cc). In addition, Hanna had witnessed House using her private phone to orchestrate the campaign against Litvinova, "suggesting Ana House knew her conduct was improper and was hiding it from her employer." *Id.* ¶¶ 10(n), (cc). Kaiser assigned Senior Employee Relations Investigator Amy Berbower to investigate Litvinova's complaints. *Id.* ¶ 10(dd). Berbower issued a report on January 5, 2024, "finding all of Plaintiff's complaints unsubstantiated." *Id.* ¶ 10(ff). Litvinova disagreed with Berbower's conclusions and alleges that Kaiser "deliberately conducted a sham investigation." *Id.* ¶ 10(gg); 10(hh).

In 2024, Litvinova sent two letters to regional office representative Jacqueline Baratian. *Id.* ¶ 10(o). Litvinova's June 2024 letter reported "ongoing patient safety violations, management's failure to maintain competent staff, and abuse of power." *Id.* In a July 31, 2024 letter, Litvinova raised concerns about the assignment of "unqualified nurses to care for critically ill PACU patients" in violation of state and federal laws. *Id.*

On January 17, 2025, Litvinova observed and reported "critically dangerous understaffing . . . creating dangerous conditions for patients." *Id.* ¶ 10(p); *id.* ¶ 10(kk). Litvinova believed this understaffing violated state and federal laws regarding staffing requirements, nurse-to-patient ratios, and patient safety. *Id.* ¶ 10(p). Litvinova sent multiple emails to management, including House, Assistant Nurse Manager Suzette Smith, and Clinical Nursing Director Lionel

---

[2] The FAC does not identify Hanna's last name.

Hoyte, about her concerns. *Id.* On January 22, 2025, Litvinova escalated her concerns about understaffing to Sloan, as her prior emails to management had been ignored. *Id.* ¶¶ 10(p), (mm).

On May 27, 2025, Litvinova "submitted an Employee Risk and Responsibility Form reporting continuing patient safety violations."[3] *Id.* ¶ 10(q).

The FAC alleges that, "[t]hroughout this period, Plaintiff made these disclosures in her individual capacity as a licensed Registered Nurse with mandatory professional duties under California law to report unsafe patient care conditions and violations of healthcare regulations[.]" *Id.* ¶ 9(a); *see id.* ¶ 10(r). The FAC further alleges that Litvinova made her complaints "to persons with authority over her and to persons with authority to investigate, discover, or correct violations[.]" *Id.*

### B.    Alleged Retaliation

In response to Litvinova's complaints, Kaiser's "attitude shifted dramatically, and a pattern of escalating retaliation began." *Id.* ¶ 10(s). In 2023, House conducted three investigatory meetings into alleged complaints about Litvinova. *Id.* ¶ 10(t) (February 28, 2023 meeting); *id.* ¶ 10(v) (June 23, 2023 meeting); *id.* ¶ 10(y) (August 10, 2023 meeting). The June 23, 2023 meeting took place one day after Litvinova submitted written concerns to management. *Id.* ¶ 10(v).

Due to the stress of the February 28 investigatory meeting, Litvinova took a leave of absence from March 1 to April 11. *Id.* ¶ 10(t). When Litvinova returned on April 11, 2023, "House arbitrarily delayed Plaintiff's reinstatement" and "demand[ed] a one-week waiting period" even though Litvinova had a doctor's clearance note and House had texted Litvinova one week prior to confirm shift coverage. *Id.* ¶ 10(u). Despite having returned to work, Litvinova received a zero-dollar paycheck for the month of April 2023. *Id.*

On August 15, 2023, House placed Litvinova on administrative leave after Litvinova objected to House's questioning during a purported outcome meeting. *Id.* ¶ 10(aa). Litvinova received a written warning for conduct on August 23, 2023, "her first disciplinary action in 31 years

---

[3] The FAC does not identify to whom the Employee Risk and Responsibility Form was submitted, nor does it state whether Litvinova received any response.

of exemplary employment." *Id.* Litvinova took her second medical leave from October 13 to November 21 due to stress caused by the alleged retaliation. *Id.* ¶ 10(bb).

Four days after Litvinova's January 17, 2025 report to management regarding the unsafe staffing situation, House removed Litvinova from her charge nurse leadership role. *Id.* ¶ 10(ll). Although Litvinova had been a charge nurse for more than 20 years and was the most senior nurse in the PACU, House began assigning less senior and less experienced nurses to the charge nurse position. *Id.* Management held an investigatory meeting with Litvinova regarding the January 17 staffing incident during which House attempted to "reframe" Litvinova's reports as "misconduct" and Litvinova received a "verbal warning." *Id.* ¶ 10(ll). Litvinova filed a "formal internal grievance" on February 11, 2025, following her removal from the charge nurse role, but Kaiser dismissed her claim ten days later. *Id.* ¶ 10(pp). Kaiser's investigation showed that Litvinova had not properly escalated her complaints regarding "patient safety or operational concerns." *Id.* Litvinova disputes these findings. *Id.* ¶ 10(qq). Litvinova responded to HR Consultant Tiffany Vandevoir on February 21, 2025, highlighting her spotless disciplinary record and the alleged retaliatory actions. *Id.* ¶ 10(rr).

Litvinova continued to be denied a charge nurse role in February and March 2025, resulting in financial losses. *Id.* ¶ 10(ss). In April 2025, Litvinova received another investigatory meeting letter, causing her to experience chest pain and heart palpitations and seek medical attention at the Emergency Department at Kaiser Oakland Medical Center. *Id.* ¶ 10(vv). Later that month, on April 23, 2025, Kaiser denied Litvinova's Step 3 grievance. *Id.* ¶ 10(tt). As a result of this denial, Litvinova had exhausted all internal remedies. *Id.*

During March, April, and May 2025, management bypassed Litvinova after she failed to promptly respond to a call schedule sign-up request despite being on vacation (*id.* ¶¶ 10(xx), (aaa)), excluded her from staff-wide meetings (*id.* ¶ 10(yy)), and denied her overtime hours (*id.* ¶¶ 10(zz), (aaa)).

In July 2025, Litvinova noticed that Kaiser had stopped deducting her 401k retirement contributions without authorization. *Id.* ¶ 10(bbb). Kaiser's HR and Vanguard could not explain why the contributions had ceased. *Id.*

Throughout 2024 and 2025, Kaiser excluded Litvinova from participation in the People Pulse Organization survey, "a confidential employee feedback mechanism." *Id.* ¶ 10(hh).

Litvinova suffered severe emotional distress requiring medical treatment since December 2022. *Id.* ¶ 10(fff). She also suffered significant financial loss due to "loss of charge nurse opportunities, denial of overtime and extra shifts, manipulation of call schedule assignments, and forced retirement contribution compression." *Id.* ¶ 10(ggg).

## II.    Procedural History

On June 20, 2025, Litvinova sued Kaiser, Kaiser Permanente, and five individuals in San Francisco Superior Court, asserting eight causes of action: (1) Retaliation in Violation of Cal. Labor Code § 1102.5; (2) Harassment and Hostile Work Environment in Violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940; (3) Failure to Investigate and Prevent Harassment under FEHA, Cal. Gov't Code § 12940(j), Cal. Code Regs. tit. 2, § 11023; (4) Violation of Whistleblower Protections; (5) Breach of Contract; (6) Failure to Provide a Safe Working Environment; (7) Intentional Infliction of Emotional Distress ("IIED"); and (8) Negligent Supervision and Retention. Dkt. No. 1–1, Ex. A (Compl.). Kaiser removed the case to this Court asserting federal question jurisdiction based on preemption under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Dkt. No. 1.

On October 21, 2025, the Court granted Kaiser's motion to dismiss. Dkt. No. 28. Specifically, the Court dismissed with leave to amend Litvinova's retaliation, violation of whistleblower protections, harassment and hostile work environment, and breach of the collective bargaining agreement ("CBA") claims on grounds that the complaint failed to allege facts showing these claims were not preempted by the LMRA. *Id.* at 4–9. The Court dismissed without leave to amend the unsafe workplace conditions claim, finding that there is no private right of action under California Labor Code section 6400. *Id.* at 9–10. Lastly, the Court found that the claims for retaliation and harassment, intentional infliction of emotional distress, and negligent supervision and retention were preempted by the National Labor Relations Act ("NRLA") and thus dismissed them with leave to amend. *Id.* at 11–13.

6

Litvinova filed her FAC on November 7, 2025. The FAC names as defendants Kaiser and Does 1–50. FAC ¶¶ 2–3. The FAC asserts five claims: (1) Whistleblower Retaliation in Violation of Labor Code § 1102.5; (2) Retaliation and Discrimination in Violation of Health & Safety Code § 1278.5; (3) Wrongful Termination in Violation of Public Policy; (4) Negligence Hiring/Supervision/Retention; and (5) IIED. FAC ¶¶ 16–77.

Kaiser moves to dismiss all claims on grounds that they are preempted by the NLRA; dismiss the whistleblower, retaliation and discrimination, negligent hiring, and emotional distress claims as preempted by the LMRA; and dismiss the wrongful termination claim for failure to state a claim.

## LEGAL STANDARDS

### I.      Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and a complaint that fails to do so is subject to dismissal pursuant to Rule 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, Litvinova must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

In reviewing a Rule 12(b)(6) motion, courts must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, courts are not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

United States District Court
Northern District of California

7

inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). As a general rule, courts may not consider materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).

## II.    Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) allows a party to challenge a federal court's jurisdiction over the subject matter of the complaint. As the party invoking the jurisdiction of the federal court, the plaintiff bears the burden of establishing that the court has the requisite subject matter jurisdiction to grant the relief requested. *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). A complaint will be dismissed if, looking at the complaint as a whole, it appears to lack federal jurisdiction either "facially" or "factually." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or factual."). When the complaint is challenged for lack of subject matter jurisdiction on its face, all material allegations in the complaint will be taken as true and construed in the light most favorable to the plaintiff. *NL Indus. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986). In deciding a Rule 12(b)(1) motion which mounts a factual attack on jurisdiction, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "In resolving a Rule 12(b)(1) factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *In re Digimarc Corp. Derivative Litig.*, 549 F.3d 1223, 1236 (9th Cir. 2008) (cleaned up).

## DISCUSSION

## I.    *Burnside* Preemption

Kaiser contends that Litvinova's first, second, fourth, and fifth claims are preempted by Section 301 of the LMRA, 29 U.S.C. § 185. Kaiser has the burden to demonstrate preemption. *See Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987); *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514,

8

1526 n.6 (9th Cir. 1995). Section 301 of the LMRA "authorized the federal courts to develop a federal common law of CBA interpretation" and "this federal common law preempts the use of state contract law in CBA interpretation and enforcement." *Cramer v. Consol. Freightways Inc.*, 255 F.3d 683, 689 (9th Cir. 2001) (en banc). "Preemption under § 301 is not limited to 'cases specifically alleging contract violation,' but also applies 'when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract.'" *Matson v. United Parcel Serv., Inc.*, 840 F.3d 1126, 1132 (9th Cir. 2016) (quoting *Cramer*, 255 F.3d at 689, and *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)).

The Ninth Circuit has articulated a two-part test to determine whether claims brought under state law are preempted by Section 301. *See Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007). First, does the cause of action "involve[] a right conferred upon an employee by virtue of state law, not by a CBA." *Id.* "If the right exists solely as a result of the CBA, then the claim is preempted, and our analysis ends there." *Id.* Second, if the right does exist independently, then the court must consider whether it is "substantially dependent on analysis" of the CBA. *Id.* However, the "mere need to consult the terms of the CBA in the course of resolving a state law claim does not necessarily result in preemption." *Humble v. Boeing Co.*, 305 F.3d 1004, 1011 (9th Cir. 2002); *see also Livadas v. Bradshaw*, 512 U.S. 107, 124 (1994). "At this second step of the analysis, claims are only preempted to the extent there is an active dispute over the meaning of contract terms[,] [and] a state law claim may avoid preemption if it does not raise questions about the scope, meaning, or application of the CBA." *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1153 (9th Cir. 2019) (cleaned up).

State law claims preempted by the LMRA may be brought under Section 301, but they are subject to Section 301's six-month statute of limitations under Section 10(b) of the NLRA, 29 U.S.C. § 160(b). *See Del Costello v. Teamsters*, 462 U.S. 151, 155 (1983) (the proper statute of limitations for an employer's breach of a CBA is the six-month limitations period in § 10(b)). In addition, a plaintiff can only pursue a Section 301 claim if grievance procedures set forth in the CBA have been exhausted. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 989 (9th Cir. 2007) (granting summary judgment on plaintiff's Section 301 claim for failure to exhaust grievance procedures).

///

### A.    Whistleblower and Retaliation Claims

Litvinova's first and second claims allege that Kaiser retaliated against her for engaging in protected activity in violation of California Labor Code section 1102.5 and California Health and Safety Code section 1278.5.  FAC ¶¶ 16–46; *see id.* ¶ 9(a) ("Beginning in October 2022 and continuing through May 2025, Plaintiff engaged in protected activity under California Labor Code section 1102.5 and California Health and Safety Code section 1278.5 by reporting to Defendant's management, executives, and compliance personnel her good faith reasonable belief that Defendant was violating state and federal laws, rules, and regulations governing hospital operations, patient safety, and healthcare staffing.").  Labor Code section 1102.5 prohibits employers from retaliating against an employee for disclosing a violation of a state or federal statute, regulation, or rule.  Cal. Lab. Code § 1102.5(b).  Health and Safety Code section 1278.5 provides that "[a] health facility shall not . . . retaliate . . . against a[n] . . . employee, member of the medical staff, or other health care worker of the health facility because that person has . . . [p]resented a grievance, complaint, or report to the facility . . ." or "[h]as initiated, participated, or cooperated in an investigation or administrative proceeding related to the quality of care, services, or conditions at the facility . . . ." Cal. Health & Safety Code § 1278.5(b)(1).

Kaiser argues these claims fail the second prong of the *Burnside* test because adjudication of Litvinova's whistleblower and retaliation claims require analysis of the CBA's provisions.[4]  Mot. at 7–8; *see* Dkt. No. 1-2, Ex. A (CBA).  Litvinova contends that her claims are independent of the CBA and do not require interpretation of its terms.  Dkt. No. 41 ("Opp'n") at 6–8.

For the reasons set forth below, the LMRA does not preempt these claims.

---

[4] Kaiser does not dispute that Litvinova's retaliation and discrimination claims satisfy the first prong of the *Burnside* inquiry.  *See* Mot. at 7–8.  Indeed, the Court previously found that "[t]he right to be free from retaliation under California Labor Code § 1102.5 exists independent of the CBA . . . . Thus, Litvinova's retaliation claims are not preempted under the first step of the *Burnside* test."  MTD Order at 6 (citing *Quigley v. United Airlines, Inc.*, No. 21-CV-00538-WHO, 2021 WL 1176687, at *11 (N.D. Cal. Mar. 29, 2021)).

///

### 1.      Labor Code Section 1102.5 Claim

Establishing a section 1102.5 violation "requires [that] (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation." *Ross v. Cnty. of Riverside*, 36 Cal. App. 5th 580, 591 (2019) (citation omitted). "A prima facie case of retaliation" requires the plaintiff to "show [that] (1) the plaintiff engaged in protected activity, (2) the defendant subjected the plaintiff to an adverse employment action, and (3) there is a causal link between the two." *Id.*

"The Ninth Circuit has found that the three elements of a section 1102.5(b) retaliation claim 'require an inquiry into the respective actions of the employer and employee' and that such an inquiry 'will not depend on interpretation of terms in the CBA.'" *Campos v. Green Diamond Res. Co.*, 785 F. Supp. 3d 589, 599 (N.D. Cal. 2025) (quoting *Brown v. Brotman Med. Ctr., Inc.*, 571 F. App'x 572, 575 (9th Cir. 2014)). Indeed, determining whether Litvinova engaged in protected conduct and whether Kaiser retaliated against Litvinova for such conduct does not depend on the interpretation of the rights and obligations governed by the CBA.

Kaiser argues that "[t]he Court must determine whether the alleged adverse actions were retaliatory or justified under the CBA, which necessarily involves interpreting the agreement's provisions." Mot. at 8; *see id.* ("Plaintiff's amended allegations still implicate those very provisions [of the CBA]—shift assignments, scheduling, and pay practices—making preemption unavoidable."). This is insufficient to satisfy the second step of the *Burnside* analysis. First, Kaiser does not identify any specific language from the CBA that would need to be interpreted to resolve Litvinova's claim. *See Balcorta v. Twentieth Century-Fox Film Corp.*, 208 F.3d 1102, 1108 (9th Cir. 2000) ("In order to help preserve state authority in areas involving minimum labor standards, the Supreme Court has distinguished between claims that require interpretation or construction of a labor agreement and those that require a court simply to 'look at' the agreement.").

11

Second, "'[s]etting minimum wages, regulating work hours and pay periods, requiring paid and unpaid leave, protecting worker safety, prohibiting discrimination in employment, and establishing other worker rights remains well within the traditional police power of the states,' and claims alleging violations of such protections will not necessarily be preempted, even when the plaintiff is covered by a CBA." *Curtis*, 913 F.3d at 1152 (brackets in the original; quoting *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 919–20 (9th Cir. 2018)).

Third, any assertion that Kaiser's conduct was permitted under the terms of the CBA is a defense that does not give rise to LMRA preemption. *See Renteria-Hinojosa*, 150 F.4th at 1089 ("[W]hen a plaintiff's state law claim does *not* arise from a collective bargaining agreement or require interpretation of that agreement, a defendant cannot, by invoking the agreement as a defense, 'transform the action into one arising under federal law.'") (emphasis in the original; quoting *Caterpillar*, 482 U.S. at 399); *Detabali v. St. Luke's Hosp.*, 482 F.3d 1199, 1203 (9th Cir. 2007) ("If the claim is plainly based on state law, § 301 preemption is not mandated simply because the defendant refers to the collective bargaining agreement in mounting a defense . . . . A reference to or consideration of the terms of a collective bargaining agreement is not the equivalent of interpreting the meaning of the terms.") (internal brackets, quotation marks and citations omitted).

The LMRA thus does not preempt Litvinova's Labor Code section 1102.5 claim.

### 2.     Health & Safety Code Section 1278.5 Claim

Litvinova's claim for retaliation pursuant to Health and Safety Code section 1278.5 is predicated on the same allegations as her whistleblower retaliation claim. Accordingly, the Court finds that the LMRA does not preempt her section 1278.5 claim for the same reasons. *See also Flores v. Dignity Health*, No. CV 18-2464-JFW(AGRX), 2018 WL 2189469, at *5 (C.D. Cal. May 11, 2018) (LMRA did not preempt claim for retaliation in violation of Health and Safety Code Section 1278.5 because "[p]laintiff's retaliation and wrongful termination claims are firmly rooted in her allegations that Dignity Health wrongfully terminated her for complaining that it violated a state staffing law. Thus, the trier of fact will be narrowly focused on Dignity Health's motivation

United States District Court
Northern District of California

for terminating Plaintiff's employment—i.e., whether Dignity Health terminated Plaintiff because she complained about unlawful nurse to patient ratios.").

Accordingly, the LMRA does not preempt Litvinova's Health and Safety Code section 1278.5 claim.

### B.    Negligent Hiring, Supervision, and Retention Claim

Litvinova alleges that Kaiser failed to use reasonable care in hiring, supervising, and retaining employees, which caused her harm.  FAC ¶¶ 61, 66.  The FAC incorporates all alleged factual allegations without identifying the specific conduct that was "dangerous and inappropriate." FAC ¶ 64.  Presumably, the negligence claim is based on the alleged retaliatory actions of Litvinova's supervisors and Kaiser's management.

In California, "[a]n employer can be liable to a third person for negligently hiring, supervising, or retaining an unfit employee."  *Alexander v. Cmty. Hosp. of Long Beach*, 46 Cal. App. 5th 238, 264 (2020) (internal quotation marks omitted).  Because this type of claim is a species of negligence, a plaintiff must show: "(1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury."  *Mendoza v. City of Los Angeles*, 66 Cal. App. 4th 1333, 1339 (1998).  This liability "is based upon the facts that the employer knew or should have known that hiring the employee created a particular risk or hazard and that particular harm materializes."  *Doe v. Cap. Cities*, 50 Cal. App. 4th 1038, 1054 (1996).

Kaiser argues that determining whether it negligently hired or supervised its employees and managers "would require interpreting the CBA to assess whether [its] actions violated contractual obligations or were consistent with them."  Mot. at 9.  Kaiser does not identify the specific provisions of the CBA that would need to be interpreted. *See id.*  In response, Litvinova argues that the relevant inquiry—i.e., "what [Kaiser] knew (or should have known) about a supervisor's unfitness, what steps [Kaiser] took (or failed to take), and whether that failure foreseeably caused harm"—"does not require parsing contractual employment terms."  Opp'n at 17.

"'State law negligence claims are preempted if the duty relied on is created by a CBA and without existence independent of the agreement.'"  *Perez v. Foster Poultry Farms*, No. 22-CV-691-JLT-SAB, 2024 WL 279112, at *5 (E.D. Cal. Jan. 24, 2024) (quoting *Ward v. Circus Circus*

13

*Casinos, Inc.*, 473 F.3d 994, 999 (9th Cir. 2007); additional citation, internal quotation marks, and brackets omitted).  That is not the case here, as Litvinova's negligence claim invokes a duty that arises from California common law and not a provision of the CBA.  *See* FAC ¶ 65 (alleging Kaiser did not use "reasonable care in investigating, supervising, or monitoring [its] employee"); *see also* FAC ¶¶ 60–68.  Because an analysis of this claim does not require contract interpretation, LMRA preemption does not apply.  *Ward*, 473 F.3d at 999.

### C.    IIED Claim

Litvinova alleges that Kaiser engaged in "extreme and outrageous conduct" that is "a direct and proximate" cause of her "physical and emotional suffering."  FAC ¶¶ 71–73.  The FAC does not identify what specific conduct is "extreme and outrageous" and instead incorporates all prior asserted factual allegations.  *See id.* ¶¶ 69–77.  Accordingly, it appears that the "extreme and outrageous" actions are Kaiser's unlawful retaliatory and harassing conduct.

To prevail on an IIED claim, a plaintiff must prove: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Avina v. United States*, 681 F.3d 1127, 1131 (9th Cir. 2012) (applying California law).

Kaiser argues the LMRA preempts this claim because it is based on the "same alleged pattern of retaliation" that is "governed by the CBA."  Mot. at 8.  Litvinova's Opposition does not expressly address the LMRA preemption issue with respect to the IIED claim; however, because the conduct giving rise to the IIED claim is the same as the whistleblower and retaliation claims, those arguments equally apply here.

"[A]n IIED claim is not preempted 'if the CBA does not cover the allegedly extreme and outrageous conduct.'"  *Campos*, 785 F. Supp. 3d at 601 (citing *Humble v. Boeing Co.*, 305 F.3d 1004, 1013 (9th Cir. 2002)).  Such is the case here.  At the hearing, Kaiser recognized that Litvinova's IIED claim arises out of the same conduct as her whistleblower and retaliation claims.  As such conduct is not governed by the CBA, the LMRA also does not preempt Litvinova's IIED

United States District Court
Northern District of California

claim. *See supra* § I(A); *see Brown*, 571 F. App'x at 574 (LMRA did not preempt plaintiff's IIED claim because it was based on "behavior not covered by the CBA").

## II.    *Garmon* Preemption

Kaiser also moves to dismiss Litvinova's claims on grounds they are preempted under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*  Mot. at 9–12; *see San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959).  The Court need not reach this argument, as the LMRA does not preempt the claims and subject matter jurisdiction is therefore lacking.

## III.    Wrongful Termination Claim

Kaiser moves to dismiss the wrongful termination claim on grounds that Kaiser continues to employ and has not terminated Litvinova.  Mot. at 12–13.  Litvinova does not oppose dismissal.  Opp'n at 16.  However, because the LMRA does not preempt Litvinova's claims, the Court lacks subject matter jurisdiction over the action.  *Caterpillar*, 482 U.S. at 392–93.  The Court therefore declines to rule on Kaiser's motion with respect to the wrongful termination claim.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court DENIES Kaiser's motion to dismiss.  Because the Court lacks subject matter jurisdiction, the Court REMANDS the action to the Superior Court of California, County of San Francisco.[5]

**IT IS SO ORDERED**.

Dated: February 17, 2026

SUSAN ILLSTON
United States District Judge

---

[5] The parties' papers do not address whether the case should be dismissed without prejudice or remanded if the Court finds the LMRA does not preempt Litvinova's claims.  At the hearing, Litvinova requested that the case be remanded to the state court.

United States District Court
Northern District of California